RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0231P (6th Cir.)
File Name: 03a0231p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ANGELA M. JONES,
      *Plaintiff-Appellee,*

    *v.*

No. 01-2315

COMMISSIONER OF SOCIAL
SECURITY,
      *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-74924—Anna Diggs Taylor, District Judge.

Argued: March 27, 2003

Decided and Filed: July 15, 2003

Before: BOGGS, SUHRHEINRICH, and SILER, Circuit
Judges.

_____

## COUNSEL

**ARGUED:** Sharon Swingle, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL DIVISION,
Washington, D.C., for Appellant. Kenneth F. Laritz, Clinton

Township, Michigan, for Appellee. **ON BRIEF:** Sharon
Swingle, John C. Hoyle, UNITED STATES DEPARTMENT
OF JUSTICE, CIVIL DIVISION, Washington, D.C., for
Appellant. Kenneth F. Laritz, Clinton Township, Michigan,
for Appellee.

_____

## OPINION

_____

BOGGS, Circuit Judge. In December 1999 and February
2000, Angela M. Jones applied for disability insurance
benefits and supplemental security income, claiming that she
had been disabled since August 23, 1999 as a result of severe
panic attacks, an anxiety disorder, and a depressive disorder.
After the denial of her application for benefits, Ms. Jones
requested a hearing before an Administrative Law Judge
(ALJ), who found that she was not disabled within the
meaning of the Social Security Act (the Act). The ALJ's
decision became the final decision of the Commissioner of
Social Security (the Commissioner) and Ms. Jones
subsequently sought judicial review of that decision by the
district court. The district court held that the ALJ's findings
were not supported by substantial evidence in the record and
ruled in favor of Ms. Jones. The Commissioner now appeals
the district court's judgment, arguing that there was
substantial evidence in the record to support the ALJ's
decision. We agree with the Commissioner and reverse the
district court's decision.

## I

Ms. Jones alleges that she has been unable to work since
August 23, 1999, when she left her job as a machine operator
in a plastics company. She was 28 years old at the time and
had previously worked as a recycling collector, a waitress,
and a babysitter. Ms. Jones continued to apply for jobs, but
reported that she was unable to sustain them for more than a

few hours because of panic attacks and crying spells, which would cause her to leave work.

Ms. Jones first sought medical treatment for her condition on November 6, 1999, at a local health center, where she was diagnosed as having a panic disorder with agoraphobia, and a recurrent major depressive disorder, pending an initial evaluation by a psychiatrist. On November 23, 1999, Ms. Jones was seen by Dr. Burgoyne, a psychiatrist at the center, who noted that she complained of longstanding panic attacks, depression, insomnia, low motivation and dizzy spells on most days, but that she was "very organized," and was peaceful in appearance. He prescribed Imipramine and Xanax.

On December 11, Dr. Burgoyne again saw Ms. Jones, for a formal evaluation of her condition. After listing the various symptoms reported by Ms. Jones, including the fact that she had left at least seven jobs since August 1999 as a result of her panic attacks, Dr. Burgoyne stated in his report that:

Ms. Jones presents as oriented to time, place, person, and situation. She is cooperative and does not demonstrate untoward anxiety. There are no signs of psychomotor deficit, physical limitation, or tremors. Her weight is proportionate to her height. Her clothing and self care are appropriate. Her thinking is organized, goal directed, spontaneous, and progressive. She denies suicidal and homicidal ideas. There are no significant form or content deficits in speech. Her mood is euthymic in appearance. Her affect is appropriate to the situation, however it does not reflect the depression and anxiety that she complains of.

Dr. Burgoyne further noted that Ms. Jones had reported an improvement in her condition over the last three weeks, "since she [had] been taking Imipramine 100mg, and Xanax .25 mg sublingual prn impending panic." Dr. Burgoyne assigned Ms. Jones a GAF (Global Assessment of

Functioning) score of 55 and diagnosed her as having a "panic disorder with agoraphobia" and a mild first episode of major depression without psychotic features. The doctor continued her treatment with medication and directed that she return in a month for further analysis.

Ms. Jones also visited a counselor at the clinic: Kathleen Berrisford, MSW, CSW. On December 15, 1999, Berrisford reported that Ms. Jones was crying because she had "run out of gas," but that the medication was helping. On January 12, 2000, Berrisford reported that Ms. Jones was depressed most of the time, but noted that Ms. Jones was only taking one-third of her medications. On February 9, 2000, Berrisford reported that Ms. Jones was smiling and apparently felt better, concluding that the medication was having an impact on Ms. Jones's condition. In March 2000, however, Ms. Jones's condition appeared to worsen again. A different counselor, filling in for Berrisford, noted that Ms. Jones came late to the appointment, and that although Xanax had reduced the number of panic attacks and eliminated the reoccurring pains in her chest, Ms. Jones reported that she was "crying more days than not."

On March 28, 2000, Mary Gerwoll, a psychologist, examined Ms. Jones. She diagnosed Ms. Jones as having a mild recurrent major depressive order and a personality disorder with borderline features. Dr. Gerwoll noted that Ms. Jones's panic attacks were "situationally predisposed," and did not appear to meet the full criteria for a panic disorder. Dr. Gerwoll assigned Ms. Jones a GAF score of 60 and noted that her prognosis was "guarded - due to early onset and chronicity." In her notes on Ms. Jones's personal history, Dr. Gerwoll stated that "[s]ince being fired [Ms. Jones] has gotten about 20 jobs and just walked out."

In April 2000, a clinical assessment form reflected that Ms. Jones's status was improving and that she was to start taking 20mg of Paxil in addition to Imipramine and Xanax. On April 9, 2000, Dr. Kriauciunias, a licensed psychologist,

reviewed Ms. Jones's file and filled out a Psychiatric Review Form for the Social Security Administration. Dr. Kriauciunias concluded that Ms. Jones suffered from an affective disorder and a personality disorder, and checked the box that stated "a severe impairment is present which does not meet or equal a listed impairment." Dr. Kriauciunias's functional assessment was that Ms. Jones was moderately limited in her ability to remember detailed instructions, to maintain regular attendance, attention, and concentration for extended periods, and also in her ability to interact with the general public. However Dr. Kriauciunias concluded that she could perform simple, low-stress unskilled work.

In June and July of 2000, clinical assessment forms reflected that Ms. Jones's status was deteriorating. After an appointment on June 28, 2000, Berrisford reported that Ms. Jones was depressed, crying, unmotivated, missing appointments, and sleeping night and day. According to Berrisford, Ms. Jones regarded the medications as no longer working, since she was experiencing a "loss of concentration, fatigue, loss of all pleasure, [and could not] work or socialize," but she was not suicidal. In July, Dr. Burgoyne adjusted her medication by lowering the amount of Paxil and increasing her dosage of Imipramine, in an effort to return to the dosages being taken by Ms. Jones in May, when she had been feeling better.

On August 1, 2000, a clinical assessment form filled out by Dr. Burgoyne reflected that Ms. Jones was once again improving, but prescribed a new drug for Ms. Jones, Depakote, in order to deal with her "mood instability." Nevertheless, on August 19, another assessment form filled out by Dr. Burgoyne noted that the "gatekeeper" had not ordered Depakote and thus Ms. Jones had not yet been started on the drug. In addition, the form noted that she exhibited "mild pressured speech" and reported that she was unable to get out of bed three days a week, was irritable, angry, and depressed. On September 16, 2000, a clinical assessment form reflected that Ms. Jones was improving, although she

had not yet begun taking Depakote. Ms. Jones denied having disabling panic and depression. At the hearing in October 2000, Ms. Jones testified that she was taking all four drugs.[1]

## II

### *The Administrative Law Judge's Hearing*

The Social Security Act defines disability as the inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A); 20 C.F.R. § 404.1505; *see also* 20 C.F.R. § 404.1509. To be found disabled, Ms. Jones's impairments must not only prevent her from doing her previous work, but, considering her age (29 at the time of the ALJ's decision), education (eighth grade education), and work experience (machine operator, recycling collector, waitress, and babysitter), must also render her unable to engage in any other kind of work that exists in significant numbers in the national economy. 42 U.S.C. § 1382c(a)(3)(B); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993).

To determine if a claimant is disabled within the meaning of the Act, the ALJ employs a five-step inquiry defined in 20 C.F.R. § 404.1520; *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (citing 20 C.F.R. § 404.1520). Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work, but at step five of the inquiry, which is the focus of this case, the burden shifts to the Commissioner to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (determined at step

---

[1] Depakote, Paxil, Imipramine, and Xanax.

four) and vocational profile. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

At the hearing, the vocational expert (VE) testified to the fact that if Ms. Jones's testimony regarding her constant crying spells, daily panic attacks, inability to leave the house, and inability to get along with others were to be credited, there were no jobs that would fit her needs. However, the ALJ did not find Ms. Jones's testimony to be entirely credible and instead constructed a hypothetical question for the VE that incorporated his own assessment of Ms. Jones's limitations, asking the VE to assume that Ms. Jones would be capable only of light work, which was not at an "unprotected height," that did not require Ms. Jones to drive, climb, or work around dangerous or hazardous machinery, was "relatively simple and routine in nature, not requiring more than very few steps," and that the work be low in stress and include only very limited contact with other people. The VE responded that under such circumstances, Ms. Jones could perform light janitorial work, some stock positions, and material handling positions, all of which were unskilled, light work that did not "involve much contact with people." The VE further testified that there were a significant number of these jobs available in the Detroit metropolitan area.

The ALJ subsequently performed the required five-step evaluation and found that Ms. Jones's claim survived the requirements of the first four steps, but did not meet the requirements of step five, since there are jobs other than her past relevant work that exist in significant numbers in the national economy, which can accommodate her residual functional capacity. Accordingly, the ALJ denied Ms. Jones's application for benefits, having determined that she was not disabled for purposes of the Act.

*Is there substantial evidence to support the Commissioner's decision?*

In order to affirm the Commissioner's determination, the decision must be supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997). "'Substantial evidence' is defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Stanley v. Secretary of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, we must defer to an agency's decision "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

The ALJ stated in his written order that Ms. Jones was moderately impaired in social functioning, given her crying spells and her problems with anger, and had a moderate impairment of concentration, persistence, and pace. Nevertheless, the ALJ concluded that Ms. Jones's statements regarding the severity of her symptoms and her attempts to find work were not fully credible, and that she was capable of showing up at a job every day, despite Dr. Kriauciunias's assessment that she was moderately impaired in her ability to maintain attendance. Moreover, the ALJ found that she was limited to a light level of exertion on the basis of her lowered energy level resulting from her depression. Accordingly, the ALJ determined that Ms. Jones should be capable of performing light work, but work that did not include unprotected heights, driving, climbing or operating hazardous machinery, and perhaps most importantly, required only very limited contact with "the public, co-workers and supervisors."

Ms. Jones contends that the ALJ's conclusion that she is capable of performing light work, even where the contact with others is limited, is not supported by substantial

evidence. More specifically, Ms. Jones contends that the ALJ should not have disregarded her testimony and presented the VE with a hypothetical based on his own assessment, since in her opinion, her testimony was consistent with the analysis of the various mental health professionals that saw her. Had the ALJ credited Ms. Jones's testimony, she would have been, according to the VE's testimony at the ALJ's hearing, incapable of holding a job and would, therefore, be considered disabled pursuant to the Act. In addition, Ms. Jones contends that the ALJ improperly disregarded Dr. Kriauciunias's conclusion that she could not maintain regular attendance, which would also preclude her from working. We first deal with the issue of whether the ALJ's determination of Ms. Jones's credibility was supported by substantial evidence.

There is no question that subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record. *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 150-51 (6th Cir. 1990); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 852 (6th Cir. 1986). The doctors in this case diagnosed Ms. Jones with various disorders, medicated her for those disorders, and have therefore supplied the requisite objective medical condition to support Ms. Jones's claim for disability. Nevertheless, an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability. *See Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (citing *Kirk v. Secretary of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981)). In addition, the ALJ can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate. *See Townsend v. Secretary of Health & Human Servs.*, 762 F.2d 40, 44 (6th Cir. 1985). *See also Blacha v. Secretary of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (holding that the ALJ had an adequate basis to discount Mr. Blacha's

credibility, where his behavior and the medical evidence was inconsistent with the claimant's testimony).

Here, the ALJ found that Ms. Jones was not credible in light of the observations made by her own treating physician, the psychologists that separately evaluated her, and various inconsistencies in her own statements. Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying. *Walters*, 127 F.3d at 528 (citations omitted). Therefore, we are limited to evaluating whether or not the ALJ's explanations for partially discrediting Ms. Jones are reasonable and supported by substantial evidence in the record.

The ALJ first found that Ms. Jones's symptoms were not as severe as she suggested in her testimony. Dr. Burgoyne's reports support this finding, since he did not find her symptoms or her disorder to be severe and even noted in one of his reports that her complaints were "less than credible." Additionally, in Dr. Burgoyne's original assessment on December 11, 1999, he reported that Ms. Jones's appearance did "not reflect the depression and anxiety that she complain[ed] of." Furthermore, Dr. Kriauciunias found that Ms. Jones was "[n]ot significantly limited for simple, low-stress unskilled work." On several occasions, the mental health professionals who spent time with Ms. Jones noted that she was pleasant and had a normal appearance. Berrisford's notes from her therapy sessions with Ms. Jones provide the best support for Ms. Jones's testimony, in that they verify that she would have crying spells and was not always cooperative and pleasant. However, the ALJ did not dispute that Ms. Jones has the disorders she has been diagnosed with, only the severity of her symptoms, which he viewed as being in contradiction with the observations made by the medical personnel who evaluated her.

The ALJ's credibility determination with respect to Ms. Jones's testimony regarding her unsuccessful efforts to obtain work is also reasonable. The ALJ explained in his written order that he found it likely that Ms. Jones, had she been telling the truth about having left so many jobs as a result of crying spells and panic attacks, would have discussed such events with Berrisford, in whose reports such events were notably lacking. Furthermore, the ALJ relied on the fact that there were several discrepancies in Ms. Jones's testimony regarding the number of job attempts made. Although the discrepancies are potentially reconcilable,[2] Ms. Jones does not argue this on appeal and the ALJ's conclusions appear to be reasonable.

Finally, the ALJ disregarded only one conclusion made by a medical professional, and that is Dr. Kriauciunias's assessment that Ms. Jones was moderately limited in her ability to maintain regular attendance. A treating physician's opinion is normally entitled to substantial deference, but the ALJ is not bound by that opinion. *See Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987). The treating physician's opinion must be supported by sufficient medical data. *See*

---

[2]On November 6, 1999, the initial report filled out by the clinic reflects Ms. Jones's statement that she had "applied for 15 jobs and will not go due to her anxiety and depression." Dr. Burgoyne's report of December 11, 1999, states that Ms. Jones informed him that she had to leave "seven or more jobs since August of 1999." Dr. Gorwell's report from March 28, 2000, states that Ms. Jones reported having "gotten about 20 jobs" in which she "just walked out." Dr. Gorwell's report, which the ALJ determined to be in conflict with these previous statements, was filled out over three and a half months after Dr. Burgoyne's report, and thus it is not impossible that Ms. Jones's statements are consistent, if, for example, she secured a number of jobs during that time period. In fact, it may be that Ms. Jones was consolidating in her answer to Dr. Gorwell those jobs that she applied for and did not go to, with those jobs that she had started and left, and that this "discrepancy" is a misunderstanding. Nevertheless, Ms. Jones does not argue on appeal that these seemingly inconsistent statements are reconcilable. Instead she argues that these inconsistencies are part of her disability. We do not see how this is helpful to her position.

*Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). If the treating physician's opinion is not supported by objective medical evidence, the ALJ is entitled to discredit the opinion as long as he sets forth a reasoned basis for her rejection. *See Shelman*, 821 F.2d at 321. Here, we are dealing with a reviewing physician's opinion, which is due, if anything, less deference than the treating physician's opinion and thus the same standard may be applied. There was no objective medical evidence supporting Dr. Kriauciunias's assessment that Ms. Jones was limited in her ability to maintain regular attendance and the ALJ discredited his opinion by carefully reasoning that since it was undisputed that Ms. Jones was able to take her daughter to school each morning and pick her up each afternoon, she was capable of maintaining a regular schedule. The ALJ's determination was, therefore, reasonable and supported by the evidence.

The district court focused in its brief ruling from the bench on Ms. Jones's testimony regarding her crying spells, and found that since the ALJ did not explain "why [Ms. Jones] was totally disbelieved about the crying spells[,] . . . the evidence militates toward supporting [Ms. Jones's] position." This analysis is troublesome in two respects. First, as noted above, the ALJ did not in fact "disbelieve" Ms. Jones's testimony entirely as to her crying spells; he only disputed the severity of her symptoms. Furthermore, the ALJ articulated his reasons for rejecting Ms. Jones's testimony in some detail. Second, the substantial deference accorded the ALJ's findings of credibility, and the standard of review for the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g), militate in favor of upholding the Commissioner's decision even if the district court would have viewed the evidence differently. As noted above, the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ. In this case there was more than enough evidence to support the ALJ's finding.

In sum, it was entirely proper for the ALJ to present the vocational expert with the hypothetical he constructed, which did not reflect Ms. Jones's complaints, including the constant crying spells, since the hypothetical was supported by substantial evidence in the record. We therefore affirm the Commissioner's final decision.

### New Evidence

In this appeal, Ms. Jones proffers new evidence of her deteriorating mental state, including a letter from her sister dated September 24, 2001, and records from a counseling service dated October 17, 2001, in support of her claim. However, this information comes over a year after the ALJ's denial of benefits and several months after the district court's reversal and award of benefits, and cannot, therefore, be considered by this court on review. *See Wyatt v. Secretary of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992) (holding that this court is "confined to review evidence that was available to the [ALJ], and to determine whether the decision of the [ALJ] is supported by substantial evidence."). As we have noted previously, "[e]vidence of a subsequent deterioration or change in condition after the administrative hearing is deemed immaterial." *Ibid.*

The records included in the Appellee's brief from New Passages, a psychiatric clinic, reflect that Ms. Jones has "impaired insight and judgment," and that her general appearance and behavior was "[a]lert, un-groomed, cooperative, but anxious and nervous at times, crying, and also occasionally inattentive to direct questions." The clinic assigned her a GAF score of 40. These observations are inconsistent with the medical evidence that was presented to the ALJ in this case and could suggest that Ms. Jones's condition has deteriorated. Although this evidence cannot be considered by us for the aforementioned reasons, Ms. Jones has available the option of filing a new claim based on a different period of disability than the one considered here.

### III

For the reasons given above, we REVERSE the district court's judgment.