NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0810n.06

No. 08-6473

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 18, 2009**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| LARRY W. COLLINS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| COMMISSIONER OF SOCIAL SECURITY, | ) | THE EASTERN DISTRICT OF |
| | ) | TENNESSEE |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

Before: **GRIFFIN and KETHLEDGE, Circuit Judges; and CARR, District Judge.**[*]

**JAMES G. CARR, DISTRICT JUDGE**. Plaintiff-Appellant Larry W. Collins appeals from a district court order affirming the Commissioner's determination that he was not disabled and, therefore, not entitled to Disability Insurance Benefits [DIB] or Supplemental Security Income [SSI]. On appeal, Collins challenges the decision of the Administrative Law Judge [ALJ], arguing: 1) the ALJ's residual functional capacity [RFC] determination is not supported by substantial evidence; and 2) the ALJ erred in relying on the Medical-Vocational Guidelines to determine whether there is other work in the national economy that Collins can perform.

For the reasons discussed below, we **AFFIRM** the judgment of the district court.

---

[*]The Honorable James G. Carr, Chief Judge of the Northern District of Ohio, sitting by designation.

1

## Background

Claimant applied to the Social Security Administration for DIB and SSI on May 26, 2004. (Administrative Record [AR] at 53-55). The Commissioner of the Social Security Administration [Commissioner] denied his applications both initially and on reconsideration, and claimant requested an administrative hearing.

Claimant was born on October 30, 1952, and was forty-eight years old on July 15, 2001, the alleged disability onset date. He has a ninth grade education, and last worked as a laborer in construction on a pipe crew for three and a half to four years. He was fired from this job on July 15, 2001, after arguing with his boss. He alleges disability based on mental impairments.[1]

On November 3, 2004, claimant underwent a consultative examination by Alice Garland, M.S. *Id.* at 163-68. Claimant reported that he had been depressed and nervous for approximately eighteen months. He reported that a friend and girlfriend had recently committed suicide. Claimant reported additionally that he had been taking Zoloft for approximately six months, and that the medication helped his symptoms, but made him nervous and did not help him sleep. He also reported that he drank alcohol several times a week, or whenever he could afford it.

---

[1] Claimant initially alleged both physical and mental impairments. However, on appeal, he does not challenge the ALJ's determination that he has no physical impairment. We, therefore, only address claimant's claims of mental impairment. *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 491 (6th Cir. 2006) ("[W]e limit our consideration to the particular points that [claimant] appears to raise in her brief on appeal.").

Claimant told Garland that he visited with people daily, did some grocery shopping, and prepared and ate simple meals. He also told Garland that he thought he could work if his hernia were fixed and "if he could find a job that he liked and could get along." *Id.* at 167.

Garland diagnosed claimant with major depressive disorder, alcohol abuse, polysubstance abuse in remission, borderline to low average intellectual functioning, and personality disorder not otherwise specified. She assigned him a Global Assessment of Functioning [GAF] score of fifty/fifty-five.[2]

On November 9, 2004, a state physician reviewed claimant's medical records. *Id.* at 169-86. The physician stated that claimant was "able to remember and carry out simple instructions/tasks, detailed [with] some difficulty at times, but can still do so." *Id.* at 185. The reviewing physician further opined that claimant was "able to interact [with the] general public [with] some difficulty at times, but still can do so" and that claimant was "able to respond to routine changes." *Id.*

Claimant entered Lakeshore Mental Health Institute with suicidal ideations from July 29, 2005, to August 3, 2005.

In September 2005, claimant began receiving treatment from Cherokee Mental Health. *Id.* at 221-38. His treating psychiatrist diagnosed him with bipolar disorder and polysubstance abuse.

---

[2]A GAF score of fifty-one to sixty "indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 503 (6th Cir. 2006) (internal quotation omitted). A GAF score of forty-one to fifty "indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

He was assigned a GAF score of sixty. In October 2005, the psychiatrist reported that claimant was "generally pleased" with the benefits of psychotropic medications, but reported he had occasional visual hallucinations. *Id.* at 231. The psychiatrist also noted that claimant's mood was "reasonably modulated" and that his thinking was "coherent." *Id.* He assigned claimant a GAF score of fifty-five. During the course of his treatment at Cherokee Mental Health, claimant's GAF score increased from a low of fifty to sixty-five in April 2006, and sixty in July 2006.

At the hearing before the ALJ on May 9, 2007, claimant testified about his work history, symptoms and medical treatment. *Id.* at 239-55. He testified that he had applied for work after losing his job as a construction laborer working on a pipe crew, but had been rejected. He stated that he had tried to find employment at a body shop and mowing lawns. He testified that he was not hired because of the medication he was taking, and because he "never could show up on time [because he would] always miss the ride to work." *Id.* at 245.

Claimant testified that he lived alone in a mobile home and that his sister is his only source of income. He said he gets his meals from a store near where he lives, and eats them at home. He also testified that sometimes medication helps his nerves and sometimes it does not, and that when it does not, he stays inside and sleeps and watches the news and weather on television. Later in the hearing, he testified that he cannot follow a news program because he cannot "concentrate for a real long period of time," and that he gets "angry most of the time at the stuff that's on TV." *Id.* at 251-52.

On May 25, 2007, the ALJ found claimant not disabled. The ALJ summarized claimant's medical treatment records and determined that: 1) claimant was not engaged in substantial gainful

activity; 2) claimant had several severe impairments: status post hernia repair, hepatitis B, cirrhosis, depression and a personality disorder; 3) claimant's impairments are not of listing severity; and 4) claimant is unable to perform past relevant work.

The ALJ then determined that claimant had no physical limitations, but some mental limitations: "[H]e would be able to remember and carry out simple instructions; however, would have moderate limitation in detailed instructions but still can do [sic]; [he is] able to interact with general public at times but still can do [sic] and is able to respond to routine changes." *Id.* at 19. The ALJ determined that claimant's subjective complaints were not entirely credible, noting his history of treatment, the reports of the treating and examining medical sources, and the inconsistencies in claimant's testimony. The ALJ lastly determined that there are jobs in the national economy that claimant could perform.

The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied claimant's request for review on September 24, 2007.

Claimant subsequently filed the present action with the district court, which overruled claimant's objections and adopted the Report and Recommendation of the Magistrate Judge finding that the ALJ's decision was supported by substantial evidence. The district court denied claimant's motion for summary judgment and granted defendant's motion for summary judgment. This appeal, over which we have jurisdiction under 42 U.S.C. § 405(g) and 28 U.S.C. § 1291, followed.

**Discussion**

**1. Standard of Review**

The Commissioner's final decision is subject to review under 42 U.S.C. § 405(g), which provides, *inter alia*: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

We "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Colvin v. Barnhart*, 475 F.3d 727, 729-30 (6th Cir. 2007) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)).

If we find the Commissioner's decision supported by substantial evidence, we must defer to that decision "'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003)).

**2. Overview of the Process**

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. 42 U.S.C. § 1382(a). Disability is the inability "[t]o engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than twelve months." *Id.* § 1382c(a)(3)(A). An individual will only be determined to be under a disability if his impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Id.* § 1382c(a)(3)(B).

The ALJ, in determining whether a claimant is disabled, conducts a five-step analysis:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters*, 127 F.3d at 529 (citing 20 C.F.R. § 404.1520).

Under the five-step inquiry, the claimant bears the burden of proof through the first four steps, and the Commissioner bears the burden of proof at the final step. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). To prevail at step five, the Commissioner must "identify a significant number of jobs in the economy that accommodate the claimant's residual functioning capacity," *id.*, taking into account factors such as age, education, and skills. *Walters*, 127 F.3d at 529.

7

In this case, the ALJ determined that claimant carried his burden of proof through the first four steps, and demonstrated that he was "unable to perform any of his past relevant work" under 20 C.F.R. § 404.1565. This court's inquiry is thus limited to whether substantial evidence supports the ALJ's determination at step five of the inquiry—namely, whether substantial evidence supports the ALJ's determination of claimant's RFC and the availability of jobs in significant numbers that accommodate his limitations.

### 3. RFC

Claimant's first argument on appeal is that the ALJ's RFC determination is not supported by substantial evidence. He contends specifically that the record indicates that his mental impairments are more severe and limiting than determined by the ALJ, and that the ALJ was required to discuss and provide a basis for rejecting the mental limitations identified by Garland in her report. The Commissioner argues that the ALJ's decision is supported by substantial evidence.

A social security disability claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." *Id.* § 404.1545(a)(1).

In making this determination, the ALJ must consider all relevant evidence in the case record. *Id.*; Social Security Ruling [SSR] 96-8, 1996 WL 374184, at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 404.1545(a)(3). The ALJ is required to evaluate every medical opinion received. *Id.* § 404.1527(b). If the ALJ rejects a treating physician's opinion, he or she must provide a basis for this rejection. *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987).

The ALJ is, additionally, "charged with the responsibility of observing the demeanor and credibility of witnesses therefore his conclusions should be highly regarded." *Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). Discretion is "vested in the ALJ to weigh all the evidence." *Id.* On review, "we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. In reviewing an ALJ's credibility determination, "we are limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record. *Id.* We may not on appeal "try the case *de novo*, nor resolve conflicts in evidence . . . ." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Claimant asserts that the ALJ's RFC determination is incorrect because the ALJ did not properly consider Garland's evaluation. We find the ALJ's RFC determination is supported by substantial evidence.

The ALJ determined that claimant could perform unskilled work at all exertional levels. The ALJ found explicitly:

> After careful consideration of the entire record, the undersigned finds that the claimant has no physical limitation aside. However, he would be able to remember and carry out simple instructions; however, would have moderate limitation in detailed instructions but still can do [sic]; [he is] able to interact with general public with some difficulty at times but still can do [sic] and is able to respond to routine changes.

(AR 19).

9

Contrary to claimant's assertion, the ALJ considered, and did not "summarily reject[]" Garland's opinion. This case is thus distinguishable from *Shelman*, 821 F.2d 316, on which claimant relies. *Shelman* involved directly contradicting medical opinions, whereas, in the present case the medical opinions are not contradictory. In *Shelman*, the court was concerned that the ALJ relied on the opinion of a medical expert in discounting the opinion of a treating physician. *Id.* at 321.

The ALJ in this case did not wholly reject Garland's opinion as to claimant's mental limitations. Garland found that claimant "may be limited in [his] ability to do very detailed and complex work," "[his] [c]oncentration was poor," "[his] ability to get along with people, by history has been moderately to severely limited," "[he] would have difficulty responding to criticism and accepting instructions from others," and "[his] ability to get along with the public appears to be moderately to severely limited." (AR 18, 168).

In determining claimant's RFC, the ALJ found that claimant "would have moderate limitation in detailed instructions but still can do [sic]," and that he would be "able to interact with general public with some difficulty at times but still can do [sic] and is able to respond to routine changes." *Id.* at 19. These findings are consistent with Garland's opinion that "[claimant] does cook, does visit, [and] does go to the grocery store." *Id.* at 168.

The ALJ noted that claimant "has required only conservative mental health treatment other than the one time hospitalization in 2005," and that "[h]is treating mental health clinicians have treated him conservatively with psychotropics and therapy." *Id.* at 20. The record supports this finding. The Cherokee Mental Health physician noted that claimant's symptoms were somewhat

alleviated by medication and records reflect that claimant's GAF score improved over time with medical treatment.

Garland diagnosed claimant with "[m]ajor depressive disorder, recurrent, moderate to severe." *Id.* at 167. The ALJ noted Garland's observation that the depressive disorder "may be more moderate though based on [his] daily activities." *Id.* at 18, 167.

In determining claimant's RFC, the ALJ also considered claimant's testimony about his own mental limitations. At the hearing before the ALJ, claimant testified that when he is having a bad day, he stays home and watches the news and weather. The ALJ pointed out that this statement contradicted claimant's later statement that he cannot sit and watch a television program without becoming angry, and that he cannot follow a news program. It is the ALJ's responsibility to "observ[e] the demeanor and credibility of witnesses" and his conclusions on these issues "should be highly regarded." *Bradley*, 862 F.2d at 1227.

Claimant himself told Garland that he could work "if his hernia were fixed" and "if he could find a job that he liked and could get along." (AR 167). The record indicates that, in September 2006, claimant underwent a hernia repair and nothing suggests that he suffers any continuing symptoms.

The ALJ found that "claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." *Id.* at 21. Based on this observation, the ALJ "conclude[d] that the claimant's testimony concerning his

symptoms and limitations is not supported by the evidence of record and is deemed not fully credible." *Id.*

It is the ALJ's place, and not the reviewing court's, to "resolve conflicts in evidence." *Gaffney*, 825 F.2d at 100. Based on our review of the record, we therefore hold that the ALJ's RFC determination is supported by substantial evidence, including opinion evidence by Garland and the state agency physician, treatment records from Cherokee Mental Health, and claimant's own testimony.

### 4. The ALJ's Reliance on the Medical-Vocational Guidelines

Claimant's second argument on appeal is that the ALJ improperly relied on the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App'x 2 [Grids], and should instead have obtained testimony from a vocational expert before determining that there are jobs claimant could perform.

The Commissioner has the burden at step five of the disability analysis of showing that there are a significant number of jobs in the economy that accommodate the claimant's RFC and vocational profile. *Jones*, 336 F.3d at 474.

The Grids only take account of a claimant's "exertional" impairments, *i.e.*, impairments that "affect [a claimant's] ability to meet the strength demands of jobs." 20 C.F.R. § 404.1569a(b). A nonexertional impairment is one that affects a claimant's "ability to meet the demands of jobs other than the strength demands." *Id.* § 404.1569a(c). Examples of nonexertional impairments include: "nervous[ness], anxious[ness], or depress[ion]," "difficulty maintaining attention or concentrating," and "difficulty understanding or remembering detailed instructions." *Id.*

The Commissioner may meet his burden at step five by referring to the Grids unless the claimant has a "nonexertional limitation[] that significantly limit[s] the range of work permitted by his exertional limitations." *Cole v. Sec'y of Health & Hum. Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). "[B]efore reaching the conclusion that the grid will not be applied because [of the alleged] nonexertional limitations, those limitations must be severe enough to restrict a full range of gainful employment at the designated level." *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 985 (6th Cir. 1987).

The question in the present case is thus whether there is substantial evidence in the record to support the ALJ's determination that claimant's nonexertional limitations were not "significant" in that they did not have an effect on the occupational base of unskilled work at all exertional levels. If the nonexertional limitations were not significant, reliance on the Grids was appropriate.

Where a claimant has solely nonexertional impairments, unskilled jobs at all levels of exertion make up the potential occupational base. SSR 85-15, 1985 WL 56857, *4. The mental demands of unskilled work are "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." *Id.*.

The ruling also describes unskilled jobs at all exertion levels as jobs that "ordinarily involve dealing primarily with objects, rather than with data or people, and they generally provide substantial vocational opportunity for persons with solely mental impairments who retain the capacity to meet the intellectual and emotional demands of such jobs on a sustained basis." *Id.*

We find that ALJ properly relied on the Grids to find that there is other work in the national economy that claimant can perform and thus claimant is not disabled.

At step five in the instant case, the ALJ found:

> If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decision-making (SSR 85-15).

> The claimant's ability to perform work at all exertional levels has been compromised by nonexertional limitations. *However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels.* A finding of "not disabled" is therefore appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines.

(AR 22) (emphasis added).

First, although the ALJ did not extensively evaluate SSR 85-15, the ALJ's RFC determination tracks the language of the ruling. The ruling describes the mental demands of unskilled work as "the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, *4. In determining claimant's RFC, the ALJ found that "[claimant] would be able to remember and carry out simple instructions; however, [he] would have moderate limitation in detailed instructions but still can do [sic]; [he is] able to interact with [the] general public with some difficulty at times but still can do [sic] and [he] is able to respond to routine changes." (AR 19).

Second, as discussed above with regard to the ALJ's RFC determination, substantial evidence supports the ALJ's finding that claimant's mental limitations did not limit his ability to perform unskilled work at all levels of exertion. Garland indicated that claimant "may be limited in ability

14

to do very detailed and complex work," but did not indicate that claimant would be unable to perform simple work. *Id.* at 168. The Cherokee Mental Health treating psychiatrist reported that medication helped and records from the psychiatrist show this improvement over time.

With regard to the ability to "respond appropriately to supervision, coworkers, and usual work situations," SSR 85-15, 1985 WL 56857, *4, although claimant reported having some problems dealing with other people, he also reported that he tries to visit people daily. (AR 166). Garland opined that claimant "appears to be a person who would have difficulty responding to criticism and accepting instructions from others," and that "[h]e may have much difficulty with authority figures." *Id.* at 168. Garland also opined that claimant's "ability to get along with people, by history has been moderately to severely limited," but emphasized that claimant "does visit" with others. *Id.*

With regard to claimant's ability to respond to routine changes in the workplace, the reviewing physician opined that claimant would be able to respond to changes. *Id.* at 185. Claimant himself told Garland that "he guessed he could work if his hernia were fixed [and] if he could find a job he liked and could get along." *Id.* at 167.

There is, thus, substantial evidence in the record to support the ALJ's determination that claimant's mental impairments did not preclude any of the mental demands of unskilled work. His nonexertional limitations do not "significantly limit the range of work permitted by his exertional limitations," *Cole*, 820 F.2d at 771, and reliance on the Grids was therefore appropriate.[3]

---

[3]Claimant contends that the ALJ's own findings that: 1) he had no physical limitations; and 2) he could not perform past relevant work, necessitate a finding that his nonexertional limitations

**Conclusion**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

have more than "little to no effect" on the occupational base of unskilled work and thus reliance on the Grids is inappropriate. Claimant's past work was as a laborer, working construction on a pipe crew. He described his job duties as "cut[ting] and saw[ing] pipe, put[ting] pipe fittings together and lay[ing] pipe." (AR 78). The classification of a job as skilled, semi-skilled, or unskilled, is governed by 20 C.F.R. § 1568, which provides, *inter alia*:

> (a) Unskilled work. Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary work duties are handling, feeding and offbearing (that is, placing or removing materials from machines which are automatic or operated by others), or machine tending, and a person can usually learn to do the job in 30 days, and little specific vocational preparation and judgment are needed. A person does not gain work skills by doing unskilled jobs.

> (b) Semi-skilled work. Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

The ALJ could have reasonably concluded, based on the record, that claimant's past work was semi-skilled work. The ALJ's findings, therefore, that 1) claimant could not perform any past work, and 2) that his nonexertional limitations have little to no effect on the occupational base of *unskilled* work, are not inconsistent. Substantial evidence thus supports the ALJ's factual conclusion that claimant's nonexertional limitations are not significant.